Filed 9/14/21  Barney v. Com. on Prof. Competence CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSHUA BARNEY,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COMMISSION ON PROFESSIONAL COMPETENCE,<br><br>    Defendant and Respondent;<br><br>GROSSMONT UNION HIGH SCHOOL DISTRICT,<br><br>    Real Party in Interest and Respondent. | D078124<br><br><br>(Super. Ct. No. 37-2018-00022455-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.

Rothschild Wishek & Sands and Michael Rothschild for Plaintiff and Appellant.

No appearance by Defendant and Respondent.

Dannis Woliver Kelley, Jonathan A. Pearl, and Ingrid A. Meyers for Real Party in Interest and Respondent.

A student reported that her physical education teacher, Joshua Barney, touched her upper chest, the back of her leg "under [her] butt," and her abdomen during class. She reported that during class, he referenced students' bodies with words including "booty," "nipple," and "bikini body." Barney subsequently admitted to touching the student near her upper chest and her hamstring and admitted that he had previously done the same to other students, claiming he did so for their health and safety. He admitted using the words "booty," "nipples," and "bikini body" in class, claiming he did so to motivate students and for their safety. Barney's employer, the Grossmont Union High School District (District), notified Barney it intended to dismiss him. After a hearing, the Commission on Professional Competence (Commission) affirmed the dismissal, finding cause existed to dismiss Barney for immoral conduct (Ed. Code, § 44932, subd. (a)(1))[1] and persistent violation or refusal to obey school laws or reasonable regulations of the District (*id.*, subd. (a)(8)). Barney petitioned the trial court for a writ of administrative mandate. The trial court applied its independent judgment and concluded the weight of the evidence supports the Commission's finding that dismissal for immoral conduct was warranted. On appeal, Barney contends that his conduct does not qualify as "immoral conduct" under section 44932, subdivision (a)(1). We reject Barney's contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Allegations of Misconduct*

On January 24, 2017, B.P., an 18-year-old female student at IDEA Center High School, reported to the school nurse that she felt "uncomfortable

_____

[1]     Unless otherwise indicated, statutory references are to the Education Code.

2

around Barney," her physical education teacher. The school resource officer subsequently asked B.P. to provide a written statement. She wrote the following under penalty of perjury:[2]

> "Barney had me work[]out my arms[,] and when I came to school the next day[, he] was touching the top of my chest asking me how my muscles felt, then went and grabbed under my butt and told me it was time to work[]out my 'booty[,]' then repeatedly told me that the bar when I'm doing a bench press needed to come down and touch my 'titty' or 'nipple.' This has been going on for a couple days. I've been in his Maverick [homeroom] for almost two [quarters,] and he . . . always gave me a bad vibe[,] but it was just recently that he started touching me. 'Your body is going to look so amazing in a bikini this summer[.]' [H]e said that to me while I was working out my legs. In Maverick [H]our, he asked me[,] '[D]o you have a boyfriend?' When I said[,] 'No[,]' he continued to ask me questions about what guys at school liked me, and when I told him what guys I think might like me, he sounded like a jealous boyfriend[,] then asked me if I drove yet[,] and when I said 'No[,]' he said[,] "Good[,] oh I was going to help you find a job[.]' It made no sense."

B.P. continued her statement, reporting:

> "I was wearing jeans with a rip[,] and he was trying to rub the rip off the right side of my leg. He got really close to my vagina, but I didn't think anything of it at the time, and he didn't touch my vagina so I didn't think anything of it. I kind [of] just let it go. It was about last Thursday that it had happen[ed]. No I did not give him permission to touch me . . . ."

Barney was placed on leave pending an investigation of B.P.'s allegations.

On January 25, B.P. provided an additional written statement:

---

[2] All of B.P.'s written statements were signed under penalty of perjury.

"I was standing there talking to [a classmate] . . . . Barney lifted up my shirt, play punched me twice, then told me I have a really nice core. Barney then began to help me squat yesterday and stood behind me, placed his hands on my lower hips and began to help me go[.]"

On January 25, female student N.H. signed a statement under penalty of perjury reporting:

"So I have noticed this for a while but didn't think about reporting it until now. Coach Barney has a [tendency] to touch female students inappropriately. He would touch them around the shoulders and boob area and then make comments about our bod[ies] and stare at [their] boobs and butts. I do not feel comfortable around him. He sometimes grabs their thighs and asks if they are sore. I am 99[ percent] sure he touched [B.P.'s] boob on Monday. He makes comments about our bod[ies] in bikinis and stuff."

On January 27, two female students submitted statements under penalty of perjury in support of Barney. T.S. reported:

"Coach Barney is a good person [and] coach. He always asks if he can touch you to fix your form or show you what muscles you are working when doing this activity. You can ask all of his students and they will agree with what I said."

B.T. reported:

"No male or female staff member has ever [inappropriately] touched me or has said anything sexual towards me."

On February 17, 2017, Barney and his attorney met with the District's attorney, District human resources director G. Schwartzwald, IDEA Center school principal D. Napoleon, and assistant principal D. Cuizon. Schwartzwald subsequently reported by email to his supervisor:

"During the investigative meeting, Mr. Barney admitted to the following:

4

- "He asks permission of the student before touching students, and he often touches students when providing instruction instead of modeling proper technique.

- "He often touches students on the hamstring, which is just below the buttocks.

- "He stated that with two fingers, he touched [B.P.] all along and just below both collar bones, a few inches above her breasts.

- "He does not teach students the names of muscles, or muscle groups, and sexualizes instruction by statements such as: 'Work your booty, tighten your booty, you can have the best booty ever.'

- "He sexualizes instruction by statements such as: 'You're going to look great in a bikini, you're going to have a bikini body, even I will have a great bikini body.' Mr. Barney's students are both male and female.

- "Mr. Barney talks to students about exercising to improve appearance, as opposed to improving health and fitness. This is concerning for all students, especially for students with a low self-image.

- "When providing instruction on how to [b]ench [p]ress properly, he sexualizes instruction by saying, 'Bring the bar down to your [nipples].'

"During the meeting with H.R., Mr. Barney did not admit to any of this being wrong and was not remorseful. He repeatedly stated that his first concern is student safety and that he asks permission before he touches students."[3]

---

[3]     Schwartzwald's email reported that Barney said, " 'Bring the bar down to your titties,' " but Schwartzwald subsequently testified that Barney used the word "nipples," not "titties," and it was Schwartzwald's mistake to write "titties."

5

B. *Notice of Intent to Dismiss Barney*

On or about August 10, 2017, the District issued a notice of intention to dismiss and statement of charges and recommendation for dismissal and immediate suspension (Notice). The Notice alleged Barney engaged in actionable conduct, including immoral conduct (§ 44932, subd. (a)(1)) unprofessional conduct (*id.*, subd. (a)(2)), evident unfitness for service (*id.*, subd. (a)(6)), and persistent violations of or refusal to obey District policies (*id.*, subd. (a)(8)).

C. *Initial Commission Hearing*

Barney requested a hearing before the Commission to contest the allegations. A hearing was held from January 29, 2018 through February 1, 2018. At the hearing, uncontested evidence established that Barney was a permanent certificated employee of the District and most recently assigned as a physical education teacher at IDEA Center High School.

1. *Student Testimony*

B.P. testified that she was a student in Barney's "Maverick Hour" homeroom class during the third quarter of her senior year, the 2016-2017 school year. Although she was not enrolled in his physical education class, she was free at that time, so she agreed to attend physical education class with a friend. The first day she attended, Barney explained how to use one of the workout machines. He pulled the bar "really close to [her] breasts and [said] it needs to hit your tits." The next day, he touched the top of her chest near her breasts and asked if that area was sore. He also grabbed "under [her] butt" and asked if it was sore. When she was performing squats in class, he walked up behind her, placed his hands on her "lower back" near "the top of [her] butt crack" and "help[ed her] squat." When she was working out her legs, he commented "your body is going to look so amazing in a bikini

6

this summer." When she was wearing jeans with a frayed area on her upper thigh, he also tried to "wipe . . . off" the frayed area and his hand "got really close to [her] private part." Another time, Barney "lifted up [her] shirt, punched [her] in the stomach, and told [her she] had a really nice core." He asked her questions "like, if [she] had a boyfriend, what guys at school liked [her], if [she] drove, if [she] had a job, [and] where [she] lived." B.P. testified that she felt "[d]isgusted" when Barney grabbed her body and felt "gross" when he used words like "booty." B.P. went to the school nurse, told her what happened, "and asked her if it was inappropriate, because [she] wasn't sure." An assistant principal came and listened to her story, and later a detective came with the school resource officer and "took . . . a report."

N.H. was a student in Barney's physical education class. She testified that Barney would touch a student when he was demonstrating where they were supposed to feel the muscle stretching or feel it while doing the exercise. He would touch a student's thigh, calf, arm, or upper chest area. He would tell students, "Work your booty" or "You can have the best booty ever," when he was teaching leg exercises. She stated he would "touch female students a little differently than male students." He would "grab their thighs" or "their upper chest," "lower towards their boobs than their shoulder."[4] N.H. testified she "could just tell" he was staring at students' "boobs and butts." Watching him do this made her "uncomfortable," and she "felt awkward being in his class." N.H. recalled one day seeing Barney touch B.P. on "her upper chest, like right above her boob." Later, he lifted up B.P.'s shirt and said, "You have a nice bikini body."

---

[4] B.P. also testified that Barney was a "flirty teacher," and "touches all of his students, all the female students" in the same way he was touching her, adding that it was "[j]ust inappropriate."

J.M. testified that she was a student in Barney's physical education class during the first and second quarters of the 2016-2017 school year, from August through December of 2016. She took weightlifting with Barney and never saw him touch a student, other than giving a "high five." When bench pressing, he would tell her to bring the bar to her chest, and when doing squats, he would say "squeeze the booty." He never talked about "bikini bodies" in class, but he did tell students that if they continued to work hard they would look nicer when summer comes. J.M. was aware of B.P.'s allegation that Barney pulled up her shirt and touched her stomach because "B.P. was talking about it." When asked whether she had any reason not to believe B.P., J.M. stated, "She's known for being dramatic in school and lying—," and then stated, "I'm not saying it didn't happen. I don't really know exactly what happened, but she is known for being flirtatious with other teachers."

### 2. *Police Testimony*

D. Ehlers of the El Cajon Police Department is the school resource officer at IDEA Center High School. Officer Ehlers testified that he became aware that B.P. had made a report regarding Barney after he overheard the school nurse use a radio to call for an administrator to come to her office. Officer Ehlers reported to the nurse's office but did not enter initially. He observed through the windows that B.P. was visibly upset: her eyes were red and blurry, and she was crying and trembling.[5]

---

[5]    Officer Ehlers testified that "[t]he way the school and police relationship works on a school campus is the administration . . . [does] their initial investigation, if possible, before [they] involve law enforcement in any matter."

After B.P. met with the school nurse and assistant principal, the assistant principal called Officer Ehlers into her office, and she and B.P. informed him of B.P.'s claims. Officer Ehlers asked B.P. to provide a written statement about what happened. He called the police department, which sent a detective to interview B.P. B.P. provided two written statements on January 24 and provided a third written statement the following day. Also that following day, he received a statement from N.H. He interviewed numerous students and received statements from T.S. and B.T.

Detective Mansour of the El Cajon Police Department investigates sex crimes and child abuse. B.P. told him that, when she returned to Barney's class the day after she had first done bench press exercises, he placed his hands above her nipples on her breasts and asked if she was sore; pinched the base of her buttock where it connects to the top of her leg and told her to work her booty; and asked her what boys liked her and then acted like a jealous boyfriend. She also recounted an incident where Barney rubbed the rips on her jeans, causing his hand to contact her inner thigh near her vagina, over the clothing. Detective Mansour testified that, "from [his] experience, the touching of a female's breasts without permission" and "the touching of the buttocks . . . without permission, constitutes . . . sexual battery." In addition, "teachers generally don't—or aren't supposed to interact with students, whether they're adults or juveniles, in a setting where there is contact with the breasts or buttocks of the student." He considered the reported behavior to be inappropriate. Detective Mansour testified that he attempted to contact Barney by telephone and left him a message; an attorney returned his phone call and indicated that she advised Barney not to speak with the police. Detective Mansour instructed B.P. to send a message

to Barney via Facebook to see if it would elicit a response. Barney did not respond and deactivated his Facebook account.

Detective Mansour obtained a search warrant to review Barney's personnel file, which reflected that the District had disciplined Barney in 2013 for inappropriate behavior involving an adult, a teacher's aide, who made reports of sexual harassment.[6] Detective Mansour subsequently interviewed the aide who had reported the sexual harassment and a former student, T.M., who reported that she had been a freshman or sophomore student in Barney's class at a different school and witnessed Barney giving female students "back rubs or massages" and "acting flirtatious," which she felt was inappropriate. At the conclusion of his investigation, Detective Mansour submitted his case to the district attorney's office for consideration of the crime of sexual battery, but Barney was not charged with any crimes.

Detective Mansour testified that, in his experience as a police officer in sex crime investigations, witnesses sometimes would confuse dates when multiple incidents had occurred. After investigating the incidents, Detective Mansour had "no reason to disbelieve" B.P.

3. *Staff and Administrator Testimony*

L. Raimond, the school nurse, testified that B.P. came to her office and told her Barney "was rubbing some dirt off her pants[ a]nd she felt that he came very close to her privates." She was wearing jeans with "slits all the way down." B.P. also reported that Barney touched her on the muscles that she was working out, "[a]bove her breasts, maybe the muscles going into your armpit," and that it made her feel uncomfortable because it was too close to her breasts. He also had her do "deep . . . leg squats," and he held her hips

---

[6] Barney was suspended for five days in July 2013 in response to allegations of unprofessional conduct.

10

while she was going up and down. Raimond testified that she believed what B.P. said but also believed B.P.'s "interpretation of it [was] misunderstood."[7] Raimond used her radio to call for an administrator. D. Cuizon, a vice-principal, responded to the call, listened as B.P. reported the incidents again, and then took B.P. to her own office.

After meeting with B.P., Raimond prepared a written statement. The statement recounted that B.P. told Raimond she felt "uncomfortable around Barney"; that on "leg day," Barney grabbed the bottom part of B.P.'s buttocks to show her where she should feel the workout; he told her the weight bar should "touch her nipples or tits"; on another day, he asked if she felt sore "while cupping his hand under her armpit and touching above her breast"; he lifted up her shirt, punched her twice in the stomach and said, "You have a nice stiff core"; rubbed dirt off her pants and his thumb came "uncomfortably close to her privates"; held his hands low on her hips while she did squats, pushing her down and pulling her up; asked if she had a boyfriend and what guys liked her at school, and said she would "have an amazing bikini body by summer."

Z. Peck testified that he was an English and physical education teacher at another District high school between 1985 and 2015. He did not know Barney. When he instructed students on weightlifting exercises, he either demonstrated the exercise himself, using a light weight, or had a student demonstrate it. He would generally not touch a student in his physical education class; however, he would push a student's back to straighten it to prevent injury to their spine or neck. He never touched a student's hamstring below the buttocks when giving instruction. He never touched a

---

7       The nurse thought that B.P. "doesn't understand a healthy relationship. So she could misconstrue things."

11

student's pectoral muscle if they reported soreness. He testified that he did not have the ability or knowledge to judge soreness based on touching a muscle and further testified that he "wouldn't have done [that] anyway. [He] just wouldn't . . . touch them there." He did not use the word "nipples" in class. When instructing a student as to where to bring the weight bar when bench pressing, he would say "bring it down to your chest."

D. Napoleon, the principal of both IDEA Center and Chaparral High School, previously taught math, economics, virtual enterprise, and computer science, and additionally taught an advanced weight training class when he was the varsity football coach at another high school within the District. When he taught weight training, the only time he might touch a student was if he "had linemen doing really heavy squats" and "they needed help coming back up." In that case, he would touch them by putting his hands on the lifting belt. He would not touch female students.

Napoleon testified he was aware that Barney had been disciplined and left his prior school assignment due to reports of inappropriate comments made to a teacher's aide and comments made in class. He approved of placing Barney in a position to teach special education at Chaparral for the 2015-2016 school year and did not expect Barney would engage in similar conduct in the new position. At Chaparral, Barney "fit in very well with the staff" and "the students really seemed to like him."

For the 2016-2017 school year, Barney was assigned to teach physical education at IDEA center. In December 2016, before the incidents at issue here took place, students awarded Barney the "Golden Apple" award.[8]

---

[8] Napoleon testified that the Golden Apple award was given to the teacher with the most student votes and estimated that between five and 10 teachers would have been eligible for the award that year, including Barney.

12

Napoleon went inside Barney's physical education class "numerous" times during the 2016-2017 school year, spending between 30 seconds to two minutes in the class, rather than "formally" observing the entire period for purposes of completing a performance evaluation. During these times, Napolean did not observe Barney inappropriately touching any male or female students and did not hear him make any inappropriate comments to students in class.

On January 24, 2017, nurse Raimond and vice-principal Cuizon reported to Napoleon that a female student had made a complaint that Barney touched her inappropriately and made some inappropriate comments. Napoleon instructed Raimond to write a statement detailing B.P.'s report and contacted Officer Ehlers and Schwartzwald, a District human resources director. Schwartzwald promptly wrote a letter placing Barney on administrative leave pending an investigation of the allegations.

On February 17, Napoleon attended an interview of Barney with Schwartzwald, Schwartzwald's assistant, and two attorneys, in which Barney was interviewed regarding the allegations. Napoleon recalled that, during the interview, Barney acknowledged telling students to bring the weightlifting bar "down to their nipples," admitted to "poking a girl somewhere on her front region to see if she was sore," admitted to touching female students on the back of the leg, the upper chest, and the back of the arm, and admitted to saying "work your booty, tighten your booty, or you can have the best booty ever." Napoleon testified that his reaction to Barney's admissions "was honestly that [Barney] should just stop talking" because "[Napoleon] felt that everything that [Barney] admitted to was just things that he should not be admitting to. And [Napoleon] was really hoping that that's not what had happened." Napoleon stated that Barney's demeanor

during the meeting was "[m]atter of fact" and Barney did not appear to be concerned or remorseful about his conduct. Napoleon expected that a physical education teacher would use specific names of muscle groups rather than terms like "booty" or "nipple," which were "inappropriate." Based on Barney's conduct, Napoleon did not believe he should return to a classroom.

Assistant principal Cuizon testified that she received a complaint from a student in January 2017 that Barney "touched the top of her chest and below her butt." Cuizon requested and obtained statements from nurse Raimond and students B.P., N.H., T.S., and B.T. Cuizon was present when Barney was interviewed by an attorney for the District. She was "surprised" when Barney admitted to statements and conduct she perceived to be inappropriate, including touching a student who reported sore muscles, using the term "nipples," and telling kids they would have a "bikini[-]ready body." Cuizon was also present at a meeting in May 2017 when District human resources personnel interviewed B.P. regarding her allegations against Barney. Cuizon recalled that B.P.'s statements during that meeting were consistent with her earlier statements. Cuizon did not believe Barney should be returned to the classroom.

On January 24, 2017, G. Schwartzwald received a telephone call from Cuizon that there was an allegation from a student of inappropriate touching and behavior by Barney. Cuizon later emailed him B.P.'s written statements. Schwartzwald testified the allegations caused him "great concern." He contacted District assistant superintendent of human resources J. Mottershaw regarding the need to put Barney on paid administrative leave pending an investigation. He also advised Cuizon, or someone at the school site, to ensure that law enforcement was notified. He later advised Cuizon to interview N.H., the only known potential witness to the events, and asked

14

her "to see if there were any other witnesses or students who knew anything." He recalled attending the meeting where Barney was interviewed regarding the allegations and stated he "was a little stunned" when Barney admitted to touching students but did not admit it was wrong, show remorse, or acknowledge he could have done anything differently. He recalled Barney said he would always ask students for permission before touching them, which Schwartzwald "found disturbing because it's an adult in a power position dealing with students repeatedly asking if he could touch them." He recalled Barney "showed [them] that he touched [B.P.] below her collarbone on both sides" and seemed to believe that was "fine . . . to find out if she was sore, had sore muscles, instead of asking her." Barney admitted he touched students on the hamstring on the back of the thigh, but insisted he did it "with a closed fist and always asked permission." Barney admitted he talked in class about "working your booty and having a bikini body" but did not talk about muscle groups. Barney admitted he told students to bring the weight bar down to their "nipples," which Schwartzwald felt "sexualiz[ed] the instruction." Barney expressed that he was doing nothing wrong, and when he touched the students it was either "for students' safety," or "he asked permission so it was really okay." Schwartzwald also recalled meeting with B.P. in May 2017 and recalled that her statements during that meeting were "very consistent" with her prior statements.[9] Schwartzwald testified that Mottershaw was responsible for recommending Barney's dismissal. Schwartzwald did not believe Barney should return to the classroom.

---

[9] When asked why the District waited so long to interview B.P., Schwartzwald responded that the District and Barney were engaged in settlement discussions and he did not feel the need to conduct further investigation while there was the potential of reaching a settlement agreement.

J. Mottershaw was first advised of the allegations against Barney of inappropriate touching and comments on January 24, 2017, by Schwartzwald. She advised Schwartzwald to place Barney on paid administrative leave so the District could conduct a thorough investigation. After reviewing B.P.'s statement, Mottershaw "was concerned" but felt she did not yet have all the facts and was unwilling to "leap" to a conclusion. Mottershaw relied on "site administration" to interview witnesses involved in the investigation and directed Schwartzwald to meet with Barney to discuss the allegations. After reviewing Schwartzwald's report of that meeting, Mottershaw felt "there are a lot of consistencies in what [B.P.] alleged, what [N.H.] allege[d], and what Mr. Barney admits." She believed that the statements Barney admitted to making were "inappropriate" and "unprofessional" statements "regarding body parts," and that any touching of students, with or without permission, was not appropriate. Mottershaw testified, "[T]here's very rarely a time or place that [a teacher] need[s] to touch a student. It should not be a part of [one's] teaching practice."

Mottershaw was aware from Barney's personnel file of the "incidents of 2013." She felt that "there was a definite pattern of behavior, even admitted by Mr. Barney in his interview" and B.P.'s allegations "were consistent" and "did not change." Mottershaw concluded "it was a liability to have Mr. Barney back in the classroom, that he lacked good judgment[, and that h]is behavior is immoral."

Mottershaw testified that efforts were made to resolve the dispute "without formal charges," but when it appeared that informal resolution "was not going to be possible," she arranged to interview B.P. Schwartzwald and Cuizon were present for the interview. Mottershaw found B.P. to be credible and noted that her statements during the interview were "completely

consistent" with her prior statements. Mottershaw "felt very strongly that student safety was of concern and that Mr. Barney is a liability to put back in the classroom."

Mottershaw acknowledged that the code of ethics within the Board Policy Manual indicated that all employees, including Barney, were expected "to maintain the highest ethical standards, to follow District policies and regulations, and to abide by state and national laws." (See District Board Policy Manual, §§ 4119.21, 4219.21, 4319.21.) Mottershaw opined that Barney violated this policy with behavior that "show[ed] disrespect for students and previously staff" that was "unprofessional" and "immoral."

Mottershaw acknowledged that the policy of nondiscrimination in District programs and activities required that "District programs and activities shall be free from discrimination based on sex, race, color, religion, national origin, ethnic group, marital or parental status, physical or mental disability, sexual orientation or any other unlawful considerations, whether actual or perceived." (See District Board Policy Manual, § 0410.) She further acknowledged the District policy proscribing sexual harassment, which prohibits "verbal, visual, or physical conduct of a sexual or gender-based nature made by someone from or in the . . . educational setting" and provides that "[u]nwelcome leering," [u]nwelcome graphic verbal comments about an individual's body, or overly personal conversation," "[u]nwelcome touching, patting, pinching, stroking, squeezing, tickling, or brushing against a person," "may constitute sexual harassment." (See *id.*, § 4119.11.) Mottershaw opined that Barney violated these policies because his comments regarding "a child's appearance [and] body" were a "form of discrimination," or could have been taken as such. She also opined that the allegations of "staring at breasts and butts, unwelcome leering, gender-based slurs,

sexually degrading descriptions [such as] bring the bar to your nipples," references to "bikini bodies," and behavior including "[u]nwelcome touching, patting, pinching, squeezing" were "sexually suggestive" or "unwelcome sexual or gender-based" comments.

Mottershaw acknowledged that the "positive school climate" policy within the Board Policy Manual indicated the desire "to enhance student learning by providing an orderly, caring, and nurturing educational and social environment in which all students can feel safe," that "[t]he school environment should be characterized by positive interpersonal relationships among students and between students and staff," that "[a]ll staff are expected to serve as role models for students by demonstrating positive, professional attitudes and respect toward each student and other staff members," and "[s]taff shall consistently enforce Board policies and regulations which establish rules for appropriate student conduct, including prohibitions against . . . harassment of students." (District Board Policy Manual, § 5137.) The "positive school climate" policy further prohibited "[s]exually explicit behavior." (*Ibid.*) Mottershaw testified, "I don't feel that the students feel safe if they're being touched inappropriately or inappropriate comments are being made or they're being leered at," and commented that Barney's "behavior does not demonstrate respect towards students [and] staff [members]."

Finally, Mottershaw acknowledged that the job description for Barney's teaching position within the District required him to "prepare[] appropriate materials," "[m]aintain[] appropriate classroom control," "[s]how[] respect for students," "[c]ounsel[] with students [when] displaying inappropriate behavior," (which Mottershaw opined implied an "obligation to display that appropriate behavior as well"), to "[e]stablish[] appropriate relationships with

18

students," and to "[r]espect[] the dignity of each student." Mottershaw believed Barney violated the job description by failing to show respect for students, failing to plan appropriate materials and lessons, failing to display appropriate behavior, and failing to establish appropriate relationships with students.

On cross-examination, Mottershaw acknowledged that she did not instruct Schwartzwald to have school staff members interview the remaining students in the physical education or homeroom classes where the inappropriate conduct was alleged to have occurred.

### 4. *Barney's Testimony*

Barney testified that he holds credentials to teach special education, health, and physical education. He began teaching for the District in a classified position in October 1992 and became a certificated employee in 1999. During the 2016-2017 school year, he taught physical education at IDEA Center and also had one "Maverick Hour" or homeroom class. Barney held his Maverick Hour in the weight room. On Mondays, he and his students "would sit in a circle on mats." "[T]he kids would go around and talk about their weekends and what they did" which resulted in discussions about the students' personal lives.

He kept attendance in his Maverick Hour class and his physical education class. B.P. was a student in Barney's Maverick Hour class. Barney testified that "daily or almost daily" he stood at the door "saying hi to the kids" and gave them "high fives." On January 19 and 23, B.P. "reported" to Barney's Maverick Hour "with a high five" and told him she was going to another teacher's homeroom.[10] Barney testified that, even though B.P. was

_____

10    Barney testified the students would commonly go to other teachers' classes, with teacher permission.

19

assigned to his Maverick [H]our for two quarters, she left every day to go to another teacher's classroom. He never asked her why she was leaving every day.

Barney denied having a conversation with B.P. about the jeans she was wearing, did not remember whether or not she was wearing ripped jeans, denied wiping dirt off her jeans, and denied touching her on her thigh near her vagina.

B.P. first attended Barney's second period physical education class on January 23, 2017, even though she was not yet enrolled in that class.[11] N.H. was also a student in that class. Barney's attendance roster indicated that, on January 23, N.H. was present in class. T.S. and B.T. were students enrolled in Barney's first period physical education class.

Barney admitted he instructed students, when bench pressing, to "[b]ring the bar to your nipple or nipple line." He testified that he had previously instructed students to bring the bar to their chest but he had a student in his class who brought the bar to his upper chest and dislocated his shoulder, which caused him to change his instruction "to be a little bit more specific." He acknowledged telling B.P. on January 23 to bring the bar to her "nipples" after she improperly brought it "down to her ribs."

On January 24, 2017, Barney's attendance roster indicated N.H. "ha[d] an excused absence, per her mom," from physical education class. B.P. returned to class that day and told Barney she was "hurt." Barney said he believed she was sore. He then "talked to her about checking to see if she was sore or injured." He testified:

_____

[11]  Barney testified he had given B.P. permission to join the class with the understanding the counseling office would enroll her and she represented to him that the counseling office would enroll her.

> "I explained that to do that, I had to take two fingers and poke different spots along her collarbone and her shoulder. And I said is that okay? She said yes. [¶] So at that point, I took two fingers on my right hand [and] poked the front of her shoulder. She said ow. And then I went right across here by—right at the collarbone where the muscle intersects. Ow, ow, ow, ow, and then ow, over here. [¶] . . . [¶] . . . And I said[,] [Y]ou are sore. You are not hurt."

Barney clarified that he touched B.P. "[f]our times across the collarbone" and twice on the shoulder. He stated he "was trying to feel for . . . [e]ither knots to see if the muscle had knotted up, or . . . if it was a pulled muscle." Barney admitted that he had previously assessed other students "in the same manner that [he] assessed [B.P.] on the 24th."

Barney testified the class did a lower body workout that day. Barney demonstrated for B.P. the proper way to squat but denied touching her hips while she was squatting. Barney stated that, when it was time to do a "donkey kick" exercise, he had B.P. watch another student and explained "see how she has a flat back, see how she's tightened her hamstring. See how she's lifting her leg straight up." He then had B.P. demonstrate the exercise, but she did it incorrectly.

He testified:

> "I instructed her again on the right way to do it. And it was wrong. So then I went down on my right knee. I put my hand on her shoelace, which would be the top of her shoe, my right hand. I was on my right knee. I told her to tighten her hamstring. She did not. She said what is a hamstring? I said it's on the back of your leg. And I took two fingers, closed fist, and tapped it like that. I said tighten that. So she tightened it. I could see it contract. [¶] And then I raised her leg with my right hand once, twice. I said, now, you do it. She did it correctly."

21

Barney testified that he previously demonstrated that exercise by tapping other students' hamstrings "[i]f they were doing it incorrectly and [he] thought they were going to hurt themselves."

Barney admitted using the word "booty" in class. He stated that he used that term "to relate to the kids" because "that's their language," to motivate the kids who told him their goal was "to have a good booty," and to tell the kids to dress appropriately for leg day workouts because they would be "working booties." He stated he used the word "booty" in class on January 24 when he saw a student who had said she wanted a good booty "kind of wilting," and he tried to motivate her by saying, "Let's go. Work your booty. Keep working." He did not direct his comments to B.P.

Barney also admitted he talked about "bikini bodies" on January 24. He testified that one student in the class had a goal "to lose weight so she could look good in her bikini . . . this summer," and he tried to motivate her by commenting, "Keep working hard. You can have the bikini body you want." He said he did not direct the comment to B.P. specifically but rather to the entire class. Barney admitted asking B.P. about boyfriends on January 23. He stated that he saw her "kind of messing around" with another student in the class and asked her if he was her boyfriend because he believed she was going to be enrolled in the class for the rest of the quarter and would not partner them together if they were involved.

Barney denied touching B.P.'s breasts and denied grabbing her "butt." He acknowledged touching students' hamstrings but denied grabbing the "bottom of [any students'] buttocks."

Barney admitted having a conversation with B.P. about a driver's license. He stated he knew several people who owned restaurants and had previously referred students for jobs at their restaurants, so he wanted "to

22

see if she had transportation for a potential job, if she was interested." He said the restaurant owner asked him to "make sure that they have driver's license, transportation," but he acknowledged B.P. would not necessarily need a driver's license to get to this job. B.P. did not ask Barney about a job, and Barney did not talk to any other students about this position.

Barney admitted telling B.P. she had "a strong core" but denied touching or lifting her shirt and play punching her abdomen. He denied staring at students' breasts or butts. He testified that he referred to certain muscle groups, like "triceps," "quads," and "hamstrings," in class but did not use the term "glutes."

Barney testified that, during the meeting at the District office in February, he did not feel he had the opportunity to explain the allegations against him and felt the method of questioning was "[a]ccusatory . . . instead of sincerely trying to figure out what [he] did."

Barney acknowledged he was previously suspended for violating District policies regarding sexual harassment, and in connection with that notice of unprofessional conduct he was given several directives to follow. Among the directives were not to engage in conversations or communications in which he made reference to any students' physical attributes, body shape, or body part, not to discuss his personal relationships or other personal inappropriate matter, and not to make sexual innuendoes with any student. He testified he felt he followed the directives.

When asked whether he would repeat his conduct if he returned to the classroom, Barney stated "[he] would learn from this experience and change [his] ways, for sure, because [he] got disciplined." He further stated that "[he] thought [he] was doing the correct thing," and "if [he] was ever, ever told do

23

not do this or, hey, this is—something's wrong, don't do this, [he] would not have done it."

D.  *First Commission Decision*

On March 5, 2018, the Commission issued a unanimous decision dismissing Barney from employment and affirming the Notice.  The Commission observed that, "regarding the most salient issues, [s]tudent B.P.'s statements to Ms. Raimond, Ms. Cuizon, Officer Ehlers and Ms. Mottershaw were consistent.  Her oral statements were consistent with her written statements.  Most significantly, despite some inconsistencies, the statements of B.P. and N.H. were consistent with [Barney's] statements.  [¶] Further, based on his [own] testimony, [Barney] did not understand that others might misinterpret his conduct."  The Commission noted that Barney admitted telling students to bring the weight lifting bar to the "nipple" or "nipple line" when teaching them to do a bench press, admitted touching students to assess whether they were injured, admitted touching B.P.'s upper chest or collar bone purportedly to assess her injury, admitted he "tapped" the back of B.P.'s leg when teaching her to do a particular lower body exercise, admitted he told B.P. she had a strong core, admitted using the word "booty" in physical education class and telling students they would look amazing this summer in a bikini, and admitted asking B.P. if she had a boyfriend, had a job, and if she drove.  The Commission found that B.P.'s version of events "was more credible than [Barney's] version."

The Commission concluded that, based on the evidence, "it was established that [Barney] touched females inappropriately; he touched them around their shoulders and 'boob' areas; he made comments about their bodies and stared at their 'boobs and butts'; Student N.H. did not feel

24

comfortable around [Barney]. He grabbed 'thighs' and asked if they were sore. He made comments about their bodies and 'stuff.' "

The Commission further concluded that the evidence established Barney violated the District's board policies regarding expectations for certificated employees and policies prohibiting discrimination, intimidation, harassment, and bullying. The Commission observed that, in light of Barney's 2013 discipline, this was "not the first time" that Barney had engaged in this sort of conduct, yet, despite his prior discipline, he did not seem to understand that his conduct was wrongful or could be misconstrued.

The Commission concluded that the evidence established Barney engaged in immoral conduct (§ 44932, subd. (a)(1)), unprofessional conduct (*id.*, subd. (a)(2)), evident unfitness for service (*id.*, subd. (a)(6)), and persistent violation or refusal to obey school laws or reasonable regulations of the District (*id.*, subd. (a)(8))—establishing good cause for his dismissal.

E. *First Writ Petition*

In May 2018, Barney filed a petition in the superior court seeking a writ of administrative mandamus. In April 2019, the trial court granted Barney's petition in part, making two findings. First, the District and Commission lacked jurisdiction to proceed with the unprofessional conduct charge because the District failed to timely provide Barney with "written notice of the unprofessional conduct, specifying the nature thereof with such specific instances of behavior and with such particularity as to furnish the employee an opportunity to correct his . . . faults and overcome the grounds for the charge" (§ 44938, subd. (a)). Second, the Commission was prohibited from considering evidence relating to matters that occurred more than four years before the Notice was issued (§ 44944, subd. (b)(2)(A)), which barred consideration of the allegations from the 2012-2013 school year (including the

prior discipline). The superior court remanded the matter to determine whether the Commission would reach the same decision or impose the same penalty without an adverse finding on the unprofessional conduct charge and without consideration of incidents from the 2012-2013 school year.

F. *Commission Hearing and Decision on Remand*

In July 2019, the Commission held a hearing on remand. The parties presented arguments but no additional evidence was received. The Commission vacated its prior decision and issued its decision after remand in August 2019. In its second decision, the Commission again unanimously affirmed the Notice and granted the District's request to dismiss Barney.[12]

The Commission observed that the District's investigation of B.P.'s allegations "was not optimal" inasmuch as the District did not question the students who were present in the physical education class or the Maverick Hour during the times that B.P. alleged the misconduct occurred. The Commission acknowledged that there was some inconsistency in the testimony but observed that, "regarding the most salient issues, [s]tudent B.P.'s statements to Ms. Raimond, Ms. Cuizon, Officer Ehlers and Ms. Mottershaw were consistent. Her oral statements and testimony were consistent with her written statements. Most significantly, despite some inconsistencies, the statements of B.P. and N.H. were consistent with [Barney's] statements." The Commission noted that Barney admitted telling students to bring the weight lifting bar to the "nipple" or "nipple line" when

_____

[12] The decision on remand removed all discussion of the 2012-2013 incidents and the unprofessional conduct charge and included the following statement: "In making the legal conclusions in this case, as ordered in the writ of mandate, the Commission did not consider the evidence that was four years or more before the [Notice] was filed. Nor did the Commission consider the alleged cause for dismissal of unprofessional conduct."

26

teaching them to do a bench press, admitted touching students to assess whether they were injured, admitted touching B.P.'s upper chest or collar bone purportedly to assess her injury, admitted he "tapped" the back of B.P.'s leg when teaching her to do a particular lower body exercise, admitted he told B.P. she had a strong core, admitted using the word "booty" in physical education class and telling students they would look amazing this summer in a bikini, and admitted asking B.P. if she had a boyfriend, had a job, and if she drove. The Commission found that B.P.'s version of events "was more credible than [Barney's] version."

The Commission concluded that, based on the evidence, "it was established that [Barney] touched females inappropriately; he touched them around their shoulders and 'boob' areas; he made comments about their bodies and stared at their 'boobs and butts.' He grabbed 'thighs' and asked if they were sore. He made comments about female students' bodies and 'stuff.' [Barney] caused [student] N.H. to feel uncomfortable in his class."

The Commission further concluded that the evidence established Barney repeatedly violated the District's policies regarding expectations for certificated employees and policies prohibiting discrimination, intimidation, harassment, and bullying.

The Commission observed that:

"While working as a physical education teacher, in his weight training class, [Barney] engaged in the following conduct:

- "He touched students when providing exercise instruction instead of modeling proper technique.

- "He touched students on the hamstring, which is just below the buttocks.

- "He used two fingers and touched student B.P. along and just below the collar bones, a few inches above her breasts.

27

- "He made statements such as: 'Work your booty,' 'Tighten your booty,' 'You can have the best booty ever' and 'Bring the bar down to your nipples' or something similar rather than using anatomic terms.

- "He did not teach students the names of muscles or muscle groups.

- "He emphasized with his students the importance of exercise to improve appearance as opposed to improving health and fitness."

The Commission further found:

"At no time has [Barney] expressed true remorse for his misconduct. At no time did [Barney] accept responsibility for his actions. Instead, he sought to justify his conduct that occurred during the 2016-2017 school year (until January 24, 2017). There was no evidence that [Barney] appreciated the wrongfulness of his acts or his bad judgment."

The Commission further found:

"[Barney's] misconduct and inappropriate language evidence his disregard for the District's primary goals and expectations that come with the teaching profession. His touching and making inappropriate and unprofessional comments, negatively impacted the work and educational environment. [His] conduct was detrimental to the District and its students. [Barney] was fully to blame for his conduct. He is not a model of good behavior. He cannot be relied upon to act morally and to uphold the responsibilities of a public educator. [Barney] has no appreciation for the wrongfulness of his act and misconduct; as such, if allowed to retain his position, it is likely that he will engage in the same or similar misconduct again."

Applying the *Morrison* factors (*Morrison v. State Board of Education* (1969) 1 Cal.3d 214 (*Morrison*)), the Commission concluded there was sufficient evidence to dismiss Barney for cause based on his immoral conduct

28

(§ 44932, subd. (a)(1)) and persistent violation or refusal to obey school laws or regulations (*id.*, subd. (a)(8)).[13]

G. *Second Writ Petition*

Barney filed a second petition for writ of administrative mandamus. Exercising its independent judgment, the trial court concluded cause existed for the District to dismiss Barney based on immoral conduct, and the court therefore denied Barney's request for a writ of mandate.

The trial court identified and summarized some of the evidence before the Commission, including B.P.'s three written statements, N.H.'s written statement, B.P.'s and N.H.'s testimony, Barney's testimony, and the testimony of the other witnesses (the principal, assistant principal, the human resources personnel, and the retired physical education teacher). After summarizing the basis for the Commission's decision, the trial court addressed and applied the relevant *Morrison* factors and rejected the arguments raised by Barney—both in his papers and at the hearing— challenging the Commission's decision. Ultimately, the court concluded that there was sufficient evidence to support the immoral conduct charge (§ 44932, subd. (a)(1)), and that Barney failed to establish any error by the Commission. Specifically, the trial court found Barney failed to meet his burden to show that "the [Commission] abused its discretion by failing to proceed in the manner required by law, that the [Commission's] decision is

---

[13]    The Commission also concluded insufficient evidence exists to dismiss Barney on the separate ground of "evident unfitness for service" (§ 44932, subd. (a)(6)).

not supported by its findings or that the [Commission's] findings and decision is not supported by the weight of the evidence."[14]

In reaching its decision, the trial court found there was sufficient evidence that (1) Barney touched students when providing exercise instruction instead of modeling techniques; (2) he touched them on the hamstring, just below the buttocks; (3) he used two fingers and touched student B.P. along and just below the collarbones, inches above her breasts; (4) he made statements such as "[w]ork your booty," "[t]ighten your booty," "[y]ou can have the best booty ever," and "[b]ring the [weight lifting] bar down . . . to your nipples," rather than using anatomic terms; (5) he did not teach students the names of muscles or muscle groups; and (6) he emphasized with his students the importance of exercise to improve appearance as opposed to improving health and fitness. The trial court found that, "irrespective of the credibility of B.P. and N.H., the evidence, including [Barney's] own admissions as well as testimony from administrators and retired teacher Peck, is sufficient to support the [Commission's] findings and sufficient to establish that both the [Commission's] findings and decision are supported by the weight of the evidence."

DISCUSSION

I

*Legal Principles and Standard of Review*

Section 44932 provides several independent grounds to dismiss a public school district permanent employee, including "immoral conduct," "evident

---

14    Having upheld the order affirming Barney's dismissal based on the immoral conduct charge, the trial court declined to consider the second charge, persistent violation of or refusal to obey school laws or regulations (§ 44932, subd. (a)(8)).

30

unfitness for service," and persistent violation or refusal to obey school laws or reasonable regulations of the District. (§ 44932, subd. (a)(1), (6), (8).) "When a school district seeks to dismiss a permanent employee, such as [Barney], for immoral conduct or evident unfitness for service, the [Commission] must hold a hearing to determine whether the charged conduct occurred and, if it did, what the proper remedy should be." (*Crawford v. Commission on Professional Competence of Jurupa Unified School Dist.* (2020) 53 Cal.App.5th 327, 336 (*Crawford*).)

The Commission's decision is reviewable through a petition for writ of mandate. (Code Civ. Proc., § 1094.5; see Ed. Code, § 44945; Gov. Code, § 11523.) The trial court reviews the administrative agency's decision under the independent judgment standard of review. (*San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1140 (*SDUSD*).) "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*).)

We review the trial court's determination under the substantial evidence test. (*Fukuda, supra,* 20 Cal.4th at p. 824 ["[e]ven when . . . the trial court is required to review an administrative decision under the independent judgment standard of review, the standard of review on appeal of the trial court's determination is the substantial evidence test"].) "The question before us 'is whether the evidence reveals substantial support— contradicted or uncontradicted—for the trial court's conclusion that the weight of the evidence supports the [administrative agency's] findings of

31

fact.'" (*Ricasa v. Office of Administrative Hearings* (2018) 31 Cal.App.5th 262, 282.) " ' " [W]e resolve all conflicts in favor of the party prevailing at the trial court level and must give that party the benefit of every reasonable inference in support of the judgment." ' [Citation.] ' "If there is substantial evidence, the judgment must be affirmed. [Citation.] We do not reweigh the evidence." ' " (*Crawford*, *supra*, 53 Cal.App.5th at pp. 336-337.) Where, as here, there is no statement of decision, we "presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record." (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718; see *Ricasa*, at pp. 282-283.)

## II

### *Substantial Evidence Supports the Trial Court's Conclusions*

The trial court concluded that the evidence supports the Commission's findings and conclusions on the charge of immoral conduct. Resolving all evidentiary conflicts in favor of the judgment, we conclude that substantial evidence supports the trial court's finding that Barney engaged in immoral conduct toward certain students and that he is unfit to teach. (*Crawford*, *supra*, 53 Cal.App.5th at pp. 336-337.)

### A

We reject two of Barney's threshold arguments regarding the applicable standard of review that governs this case, and the scope of what qualifies as "immoral conduct" for purposes of dismissing a District employee. First, Barney contends a de novo standard is appropriate because he purportedly is accepting the court's findings as true for purposes of appeal, rendering them undisputed. But it is clear the evidence *is not undisputed*, and Barney does *not accept* the factual findings—he instead contends the District should have realized "that N.H. and B.P. had concocted a false story to bolster the latter's

32

assertions," they "lied about" Barney's activities, and the evidence establishes "[Barney], and not B.P. or N.H., was truthful." We apply the substantial evidence test in reviewing the trial court's determination here. (*Fukuda*, *supra*, 20 Cal.4th at p. 824.)

Second, Barney contends that "the term 'immoral conduct' applies only to particularly egregious, unquestionably reprehensible conduct," and that the conduct here is not immoral as a matter of law. He supports this claim by noting that a finding of immoral conduct results in the same "significant direct and collateral consequences" as a conviction of a felony or a crime of moral turpitude. (See *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 348 (*California Teachers Assn.*) ["[T]eachers dismissed for immoral conduct suffer revocation of their teaching certificates. (§ 44947.)"].)[15] We disagree with Barney's narrow view of what constitutes "immoral conduct." The term " ' "immoral" ' " has been defined to mean " 'that which is hostile to the welfare of the general public and contrary to good morals. Immorality has not been confined to sexual matters, but includes conduct inconsistent with rectitude, or indicative of corruption, indecency, depravity, or dissoluteness; or as [willful], flagrant, or shameless conduct showing moral indifference to the opinions of respectable members of the community, and as an inconsiderate attitude toward good order and the public welfare.' " (*Board of Education v. Weiland* (1960) 179 Cal.App.2d 808,

---

15    Section 44947 provides as follows: "If an employee is dismissed for immoral conduct *or* conviction of a felony *or* crime involving moral turpitude, the governing board shall transmit to the Commission on Teacher Credentialing and to the county board of education which issued the certificate under which the employee was serving at the time of his dismissal, a copy of the reporter's transcript of the hearing accompanied by a request that any certificate issued by the county board of education to the employee be revoked if the employee is not reinstated upon appeal." (Italics added.)

811-812 (*Weiland*).) "Moreover, the definition of immoral or unprofessional conduct must be considered in conjunction with the unique position of public school teachers, upon whom are imposed 'responsibilities and limitations on freedom of action which do not exist in regard to other callings.' " (*San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1466 (*Lampedusa*).)

B

There is ample evidence supporting the trial court's findings that Barney engaged in the following acts of misconduct: (1) Barney touched students when providing exercise instruction instead of modeling techniques; (2) he touched them on the hamstring, just below the buttocks; (3) he used two fingers and touched student B.P. along and just below the collarbone, inches above her breasts; (4) he made statements such as "[w]ork your booty," "[t]ighten your booty," "[y]ou can have the best booty ever," and "[b]ring the [weight lifting] bar down . . . to your nipples," rather than using anatomic terms; (5) he did not teach students the names of muscles or muscle groups; and (6) he emphasized with his students the importance of exercise to improve appearance as opposed to improving health and fitness.

Barney himself admitted he touched B.P.'s hamstring and used his hand to raise her leg when she attempted to perform a lower body exercise and acknowledged touching other students in the same manner when

instructing them to perform certain exercises.[16]  He admitted he touched B.P. with two fingers along her collarbone and her shoulder to determine if she was sore or injured and acknowledged he had previously assessed other students in the same manner.  He admitted he instructed students to "[b]ring the [weight lifting] bar to your nipple or nipple line," and acknowledged telling B.P. to bring the bar to her "nipples."  He admitted using the word "booty" in class and telling students, "Work your booty" and "You can have the bikini body you want."  He admitted he did not use the terms for certain muscle groups, like "glutes," in class.  And Barney admitted asking B.P. if she had a boyfriend and telling her she had "a strong core."

Barney takes issue with some of the language used by the witnesses, the Commission, and the court—contending they mischaracterized his admissions.  For example, Barney contends he was "careful to stay away from [B.P.'s] breasts" when he touched the muscles near her collarbone, and the court's characterization that he touched her " 'a few inches above her breasts' " was "unnecessarily sexually suggestive"; "the claim of touching B.P. 'a few inches above her breasts' " was "wholly an exaggerated creation" by one of the human resources employees; he "never claimed to have 'sexualized' instruction," and he used the word " 'nipples' " but "[t]he words 'tits' or 'titties' were never used"; and he admitted to touching students' hamstrings but he was "not asked where along the hamstring length he would touch" so the

_____

16    Barney requested that this court take judicial notice of a medical illustration of the hamstring muscle.  Because there is no indication that this document was submitted to the Commission or the superior court or was otherwise considered by them, we deny Barney's request for judicial notice. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 ["Reviewing courts generally do not take judicial notice of evidence not presented to the trial court."].)

court's finding that he " 'touched students on the hamstring which is just below the buttocks' " is incorrect. It is unnecessary for the court's language to precisely match Barney's. " 'When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court.' " (*Pittsburg Unified School Dist. v. Commission on Professional Competence* (1983) 146 Cal.App.3d 964, 978.) Based on our review of the record, the trial court drew reasonable inferences from the evidence in reaching its conclusions and characterizing the nature of Barney's admissions.

C

The trial court's conclusions were also supported by other evidence in addition to Barney's own admissions.

B.P. testified that Barney pulled the weight lifting bar "really close to [her] breasts and [said] it needs to hit [her] tits"; touched the top of her chest near her breasts and asked if that area was sore; grabbed "under [her] butt" and asked if it was sore; touched her upper thigh near her "private part" while he wiped her frayed jeans; "lifted up [her] shirt, punched [her] in the stomach, and told [her she] had a really nice core"; stood behind her and placed his hands on her lower back while she squatted; and asked her if she had a boyfriend, if she drove, and if she had a job. B.P. testified that she felt "disgusted" when Barney grabbed her body and "gross" when he used words like "booty."

N.H. testified Barney would touch students in physical education class on their thighs, calves, arms, and upper chest area. He touched female students "a little differently" than male students. He would "grab their thighs" or "their upper chest," "lower towards their boobs than their shoulder." She recalled seeing Barney touch B.P. on "her upper chest, like

36

right above her boob." Later, he lifted up her shirt and said, "You have a nice bikini body." Barney would tell students, "Work your booty" or "You can have the best booty ever." N.H. testified that she got an "uncomfortable" vibe and "felt awkward" being in Barney's class.

As summarized *ante*, several witnesses described how B.P. was visibly upset when she reported Barney's behavior, and they explained her consistent reporting of his actions initially in January 2017, later in May 2017, and at the time of the hearing in January 2018.

In the aggregate, all of this evidence further supports the trial court's findings regarding Barney's immoral conduct. (See *Palo Verde Unified School District of Riverside County v. Hensey* (1970) 9 Cal.App.3d 967, 976 (*Palo Verde*).)

D

Barney contends the trial court failed to reference evidence in his favor that he claims was "[d]eterminative." Specifically, Barney claims the court failed to acknowledge: (1) the testimony from the school nurse and another student (J.M., "who confirmed B.P. to be a known liar"); (2) the statements two students made to the assistant principal describing Barney as "a 'good person and coach' "; and (3) "seven oral interviews of B.P., several being significantly inconsistent if not contradictory."

The trial court was not required to itemize or summarize every piece of evidence in the record, and Barney overstates the significance of this evidence in describing it as "[d]eterminative." The nurse initially said she did not disbelieve B.P., but rather thought that B.P. "misunderstood" the situation: "And I'm not saying it's not—that I don't believe what she said. I think her *interpretation of it is—is misunderstood*." (Italics added.) The basis for this conclusion appears questionable. The nurse made some

assumptions about B.P. (and others) based on unspecified experiences in B.P.'s life, but ultimately clarified that she was not questioning B.P.'s credibility.[17]  Similarly, although J.M. claimed B.P. was "known for being dramatic in school and lying," she then clarified she was "not saying it didn't happen" and she did not "really know exactly what happened."  And the fact that other students made statements that were favorable to Barney does not negate the overwhelming evidence—including Barney's own admissions—of inappropriate conduct.

The purported inconsistencies in B.P.'s description of Barney's conduct, the limited scope of the District's investigation, and the fact that none of the teachers or administrators saw any improper touching, also does not compel a finding in Barney's favor.  The material aspects reported by B.P. remained unchanged throughout—Barney touched her in an area between her collar bone and her actual breasts; he did not physically grab *onto* her breasts, but rather touched the top area *above* her breasts (instead of putting his hand directly *on the top of* her actual breasts).  We also find it significant that B.P. was visually describing where she was touched in her testimony before the Commission, sometimes using phrases that were not clarified for the record

---

[17]    The following testimony was elicited from the nurse:  A.  "I think this *lady [B.P.] is very mixed up*, and in my experience with *young ladies that have had issues* in their lives that she has, *they misunderstand things*."  "THE JUDGE:  So may I construe—should I construe that as you didn't find her credible?  You didn't find her believable?"  A.  "It's not that I don't find her credible.  I find her—how can I say it—would misunderstand.  I'm *not calling her a liar*.  I'm saying that she would misunderstand.  She would—she would—I don't know how else to put it, honestly.  That *she doesn't understand a healthy relationship*.  So she could misconstrue things."  "THE JUDGE:  [I]s it your testimony that you have to have a good relationship or you have to have been involved in a good relationship to know when touching is wrong?"  A.  "No."  (Italics added.)

(e.g., "Q. And did he move across your breast then? [¶] A. Yeah. He was going like this and this (gesturing)."). The Commission had the benefit of being present to see and hear B.P.'s testimony when considering her credibility. Although the trial court made no finding regarding the credibility of B.P. or N.H., and instead observed that the Commission's findings were supported by other evidence, we may still look to the existence of this evidence in considering the record as a whole. Barney contends the fact that "the entire class present on January 23rd and 24th were not immediately interviewed on the 24th was an opportunity forever lost." But he has not demonstrated how any purported defects in the *District's* investigation impaired *his ability* to defend himself. He could have called other students to testify at the hearing, but failed to do so. He similarly failed to call the two other adults he claims were present during two of the days in question. Finally, Barney claims he knows "for a fact" that the principal and vice-principal "saw [him] doing things, these things. I know for a fact." But the witnesses contradicted these claims—stating instead that they did not witness this type of inappropriate conduct—and some were in his classroom for brief periods only. It is therefore reasonable to infer that they did not have an adequate opportunity to witness Barney's immoral conduct, and that they never did, versus inferring that it never happened.

Barney's arguments are unavailing in any event because we do not reweigh the evidence on appeal. We resolve evidentiary conflicts in favor of the judgment and we give the prevailing party the benefit of every reasonable inference in support of the judgment. (See *Crawford*, *supra*, 53 Cal.App.5th at pp. 336-337.) As noted, drawing reasonable inferences from the evidence here supports the trial court's ruling.

## E

A teacher may be discharged only where his conduct demonstrates an unfitness to teach. (*Morrison, supra*, 1 Cal.3d at pp. 229-230; see *Crawford, supra*, 53 Cal.App.5th at p. 337 ["A teacher's conduct is 'immoral' . . . when it negatively affects the school community in a way that demonstrates the teacher is 'unfit to teach.' "].) "In *Morrison*, the court outlined seven factors courts should consider 'to determine whether the unprofessional conduct demonstrated unfitness to teach: " . . . [1] the likelihood that the conduct may have adversely affected students or fellow teachers, [and] the degree of such adversity anticipated, [2] the proximity or remoteness in time of the conduct, [3] the type of teaching certificate held by the party involved, [4] the extenuating or aggravating circumstances, if any, surrounding the conduct, [5] the praiseworthiness or blameworthiness of the motives resulting in the conduct, [6] the likelihood of the recurrence of the questioned conduct, and [7] the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." ' " (*Crawford*, at pp. 337-338.)

Here, the trial court correctly analyzed the Commission's decision and findings under the *Morrison* test to conclude that Barney was " 'unfit to teach' " as a result of his " 'immoral conduct.' " (See *Crawford, supra*, 53 Cal.App.5th at p. 340; *Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 697, fn. 2 [*Morrison* test applies to a proceeding for dismissal of a permanent teacher on the basis of immoral or unprofessional conduct].)

*Adverse Effect on Students or Teachers*

Pursuant to *Morrison*, we focus on the "likelihood" that Barney's conduct "may" have adversely affected students and other teachers. (*Morrison, supra*, 1 Cal.3d at p. 229.) We conclude the evidence supports the

40

trial court's implied finding that Barney's behavior may have adversely affected students or teachers.

Barney admittedly touched female students on their upper chests, the backs of their legs (their hamstrings), and referenced "nipples," "booties," and "bikini bodies" in class; this conduct made B.P. "uncomfortable" and prompted her to make a report to the school nurse. He also stared at other students' bodies in a manner that made N.H. feel uncomfortable. Barney's conduct constitutes "[u]nwelcome leering," "[u]nwelcome graphic verbal comments about an individual's body, or overly personal conversation," and "[u]nwelcome touching, patting, pinching, stroking, squeezing, tickling, or brushing against a person," in apparent violation of the District's sexual harassment policy. (District Board Policy Manual, § 4119.11.)[18] Regardless of whether it was an actionable violation of the District's policy against sexual harassment, Barney's conduct clearly adversely affected students, including B.P., who testified she felt "disgusted" when he grabbed her body and "gross" when he used words like "booty," and N.H., who testified she felt "uncomfortable" and "awkward" in his class. In addition, multiple witnesses, including District employees, administrators, and the police investigator,

---

[18] Barney claims the witness who testified about this policy "misled the [Commission] and therefore the court about that policy" because "[w]hat she testified to which the court adopted is incomplete." However, Barney never objected to the witness's testimony on this ground during the hearing (see Evid. Code, § 353), or cross-examined the witness regarding this claim. Barney also fails to cite any authority to support his claim that "[t]here must be some scienter" to show he violated the District's policies. We therefore need not consider the issue. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' "].)

testified it was rarely or never appropriate for a teacher to touch a student, even with permission. Barney's conduct caused administrators, including Napoleon, Cuizon, Schwartzwald, and Mottershaw, to feel that he should not return to the classroom, demonstrating that they had lost confidence in him,[19] and they were concerned about the safety of students as well as the District's liability if he were to remain employed. An administrator's loss of confidence in a teacher is substantial evidence of an adverse impact. (*Lampedusa, supra,* 194 Cal.App.4th at p. 1463; see *West Valley-Mission Community College Dist. v. Concepcion* (1993) 16 Cal.App.4th 1766, 1777 ["Th[e] testimony from administrators and instructors constituted substantial evidence of impairment of [teacher's] relationships with students and other faculty."].)

Barney claims he had no adverse impact on students or teachers and highlights testimony and evidence regarding positive aspects of his teaching, like his Golden Apple award, but these positive aspects do not disprove or

_____

[19] Barney contends only one witness (assistant superintendent Mottershaw) characterized Barney's conduct as " 'immoral,' " and the administrators' testimony regarding Barney's " 'inappropriate' " conduct was not "[c]ompetent [o]r [r]eliable." (Italics omitted.) He contends the testimony from administrators cannot support the court's findings because the administrators were not credentialed physical education teachers and their testimony amounts to improper lay or expert witness testimony. Barney failed to object to any of the witness testimony on this basis at the hearing. Moreover, at the hearing each witness properly testified regarding his or her own personal observations and experience. (Evid. Code, § 800 [lay witness's "testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: (a) [r]ationally based on the perception of the witness; and (b) [h]elpful to a clear understanding of his testimony"].) We also are unpersuaded by Barney's arguments that these school officials needed a credential in physical education to recognize the impropriety in Barney's conduct.

diminish the evidence of harmful, inappropriate conduct and the adverse impact such conduct had—or at a minimum was likely to have—on students and administrators.

*Proximity or Remoteness in Time of the Conduct*

"The second *Morrison* factor considers when the teacher's conduct occurred in relation to the school's disciplinary decision." (*Crawford*, *supra*, 53 Cal.App.5th at p. 341.) The evidence supports the trial court's conclusion that this factor does not favor Barney. B.P. made a report in January 2017, within a week of the conduct, and Barney was immediately suspended pending an investigation which was promptly commenced. The District issued a notice of intent to dismiss approximately seven months later. The reports of Barney's recent conduct precipitated the District's response, which was reasonably close in time to Barney's dismissal—satisfying the second *Morrison* factor. (See *Broney v. California Com. on Teacher Credentialing* (2010) 184 Cal.App.4th 462, 477 [teacher's conduct was not remote in time where it occurred in 2001 and the Commission began its hearing two years later].)

*Type of Teaching Certificate Held*

Barney held credentials to teach special education, health, and physical education.[20] In analyzing this factor, the trial court cited the testimony of Peck, a retired physical education teacher, and Napoleon, a former weight

---

[20] Barney claims he was a "neophyte first-time physical education teacher . . . oblivious to how his well-meaning and enthusiastic tactics . . . could be misperceived and twisted." Yet the evidence established that Barney has teaching credentials in "special education, health, [and] physical education," he started his employment with the District as a certificated employee in 1999, and he claimed to have 26 years of experience "coaching college and high school," including "work[ing] . . . with athletic trainers and training athletes."

training educator and varsity football coach. Their testimony established that a physical education instructor typically would not touch students during class, except under limited circumstances to protect the physical safety of a student.

Barney claims that Peck's testimony supports Barney's position that touching students was appropriate in physical education class. But Peck testified that he did not touch a student to demonstrate an exercise, he did not touch a student's hamstring or pectoral muscles, and he did not use the word "nipples" in class. Peck testified that, not only was he unable to judge soreness based on touching a student's pectoral muscle—as Barney claimed to be able to do—but he further emphasized that he "wouldn't have done [that] anyway. [He] just wouldn't . . . touch [a student] there." Principal Napoleon likewise emphasized in his testimony that he would not touch a student during a weight lifting class, unless "linemen doing really heavy squats . . . needed help coming back up," and in that instance, he would only touch the weight lifting belt. He also explained that, although he did have females in the class, he would not "engage in similar conduct towards a female student." Neither witness supports Barney's claim that his conduct was appropriate for someone teaching physical education.

We also reject Barney's claim that "there is no evidence that [his] touching was other than relatively minimal and focused upon health and safety concerns." The record established that Barney touched students when it was not necessary to do so, and for purposes unrelated to health or safety. He "play punched" B.P. and lifted her shirt before commenting on the strength of her abdominal muscles, touched students on the hamstring—purportedly to demonstrate a leg exercise—and touched students on the chest purportedly to detect injury. No evidence supports the conclusion that this

44

touching was necessary for purposes of teaching physical education class or ensuring the students' safety.[21]

*Extenuating or Aggravating Circumstances Surrounding the Conduct*

Barney admitted to nearly all the misconduct that B.P. and N.H. alleged, yet his testimony demonstrated he did not show any remorse or appreciation for wrongdoing. As the trial court noted, Barney "failed to appreciate the wrongfulness of his acts and misconduct." Barney's failure to take responsibility for his actions and his attempts to justify his behavior are aggravating circumstances bearing on his fitness to teach. (See *Lampedusa, supra*, 194 Cal.App.4th at p. 1464 [failure to recognize wrongfulness and take responsibility for misconduct constitute aggravating circumstances].)

*Praiseworthiness or Blameworthiness of Barney's Motives*

While Barney indicated his intentions were to properly teach and motivate his students, neither the Commission nor the trial court were required to accept these claims. Moreover, the manner in which he attempted to achieve these purported goals—touching the students unnecessarily and inappropriately and sexualizing instruction by referencing "nipples," "booties," and "bikini bodies"—was blameworthy. Barney classifies his misconduct as "a reasonable, good faith, professional judgment" with which higher authorities within the District later disagreed. But the

---

21      Barney contends he was directly instructed not to send students to the nurse's office *and* to assess them himself first. This claim was contradicted by the principal's testimony. The principal explained he was merely concerned about having too many unaccompanied students roaming the halls. This in no way supports Barney's actions in touching female students to purportedly assess for injury despite having no medical training. In fact, Barney ultimately admitted at the hearing that the principal did not tell him to "check out students," i.e., assess students for injuries, "before sending them to the nurse."

blameworthiness of Barney's conduct—including inappropriate, sexualized language and unwanted touching—was evident from the outset and caused his students discomfort and distress. (See *Palo Verde, supra,* 9 Cal.App.3d at p. 975 ["a teacher has a responsibility to respect the feelings and sensitivities of the members of his class and to conduct himself with a certain degree of rectitude"].) Moreover, his emphasis on fitness to "tighten [a student's] booty" or achieve a "bikini body" rather than emphasizing fitness for purposes related to physical and mental health indicates Barney failed to fulfill his role as an instructor and demonstrated poor judgment.

*Likelihood of Recurrence of the Questioned Conduct*

The evidence supports the trial court's finding of a risk that Barney's conduct would recur. As previously noted, although Barney admitted engaging in the misconduct, his testimony demonstrated he did not show any remorse or appreciation for wrongdoing. He did not take responsibility for his actions and attempted to justify his behavior. Barney claims his statements to the Commission that "if [he] went back in the classroom today, [he] would learn from this experience and change [his] ways, for sure, because [he] got disciplined," indicate that his inappropriate behavior would not recur. Yet the Commission was not required to accept Barney's self-serving statements, and, indeed, found Barney was not credible. Moreover, Barney also told the Commission that "[he] thought [he] was doing the correct thing," indicating a lack of appreciation and understanding of appropriate classroom behavior. There is no indication that Barney would change his behavior if he were allowed to continue teaching, indicating it is likely that the misconduct would recur.

46

*Chilling Effect Upon Constitutional Rights*

In his briefing, Barney does not address this factor, "which evaluates whether the disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." (*Crawford*, *supra*, 53 Cal.App.5th at p. 343.) Barney therefore has waived any contention with regard to this factor. (See *ibid*. [failure to brief seventh *Morrison* factor waived any right to raise issue on appeal].)

In sum, we conclude there is substantial evidence to support a finding under the *Morrison* criteria that Barney's conduct "was so offensive, inappropriate, or immoral that it rendered him unfit to teach." (*SDUSD*, *supra*, 214 Cal.App.4th at p. 1150.) Barney's inappropriate and unnecessary touching of students and use of sexualized language constitutes " 'immoral conduct' " because it " 'is hostile to the welfare of the general public and contrary to good morals,' " " 'indicative of . . . indecency,' " and " 'show[s] moral indifference to the opinions of respectable members of the community, and . . . an inconsiderate attitude toward good order and public welfare.' " (*Weiland*, *supra*, 179 Cal.App.2d at pp. 811-812.)

F

Barney contends his "conduct may be considered—at worst—unprofessional conduct or unsatisfactory performance," and these "more benign dismissal grounds" should have been alleged instead of immoral conduct.

As Barney acknowledges, in the initial Notice, the District *did allege* unprofessional conduct. In connection with the first writ petition, however, the trial court remanded the matter and directed the Commission to determine whether it would reach the same decision or impose the same penalty without the unprofessional conduct charge. That order is not the

47

subject of this appeal, and the scope of our review is limited to a determination as to " ' "whether the evidence reveals substantial support—contradicted or uncontradicted—for the trial court's conclusion that the weight of the evidence supports the [administrative agency's] findings of fact." ' " (*Crawford, supra*, 53 Cal.App.5th at pp. 336-337.) We have already concluded that the evidence supports the trial court's conclusion that Barney's conduct constitutes immoral conduct and his dismissal was properly affirmed.[22]

Moreover, we do not second-guess the District's charging decision. " '[A] disciplinary discharge often involves complex facts and may require a sensitive evaluation of the nature and seriousness of the misconduct and whether it warrants the grave sanction of dismissal.' " (*California Teachers Assn., supra*, 20 Cal.4th at pp. 343-344.) The District has "substantial leeway in determining when to take disciplinary action against a permanent employee and what action to take." (*Fontana Unified School Dist. v. Burman* (1988) 45 Cal.3d 208, 215.) "The same conduct, *in the judgment of the employing district*, may constitute grounds for suspending or for dismissing a permanent employee, and nothing in the statutory scheme limits the ability

---

[22] In his reply, Barney contends the initial charge including the unprofessional conduct allegation "was a sham," the "District intentionally failed to meet jurisdictional prerequisites incident to that" charge, and the "District's true intent, at all times, was his dismissal based upon an exaggerated claim of immoral conduct." Barney does not provide any citations to the record to support these claims, and we need not address them. (See *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 ["[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived"].) In addition, we do not consider these claims because they are asserted for the first time in Barney's reply brief. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4.)

of a district to pursue alternative sanctions, either simultaneously [citations] or . . . [citations] in succession." (*Id*. at p. 222, italics added.)

## G

We also reject Barney's contention reversal is warranted under *SDUSD*, *supra*, 214 Cal.App.4th 1120. In that case, the school district dismissed an elementary school teacher from employment on grounds he inappropriately touched a student. (*Id*. at pp. 1123-1124.) The Commission subsequently determined the District had not proven the teacher's evident unfitness to teach, immoral conduct, or persistent violation of school policies. (*Id*. at p. 1123.) The Commission found the testimony of the student and her mother was not credible, while the testimony of the assistant teacher who was present in the classroom and the accused was credible. (*Id*. at pp. 1137-1138.) The Commission concluded that, while the evidence established the accused teacher was physically affectionate with his students and that he had touched, for instance, their backs, the evidence did not establish that he touched the accused in an inappropriate manner, "or in any other manner that was immoral or a violation of district regulations, or that demonstrated an evident unfitness to serve." (*Id*. at p. 1139.) The District petitioned for relief in the superior court, which granted the petition and vacated the Commission's decision concluding that the accused teacher's dismissal from employment should be affirmed, because his touching the student "in the manner to which she testified constitutes immoral conduct making him unfit to teach." (*Id*. at p. 1140.) The appellate court reversed the trial court judgment, finding that the trial court did not properly apply "the presumptions and weight applicable to the Commission's findings and decision" and failed to consider all of the evidence in the administrative record. (*Id*. at pp. 1145, 1149-1150.)

By contrast, here, the Commission and the trial court agreed the evidence established that Barney engaged in immoral conduct and his dismissal was warranted. Unlike the trial court in *SDUSD*, the trial court here properly applied the presumptions and weight applicable to the Commission's findings and properly considered all the evidence in the record. This court also has reviewed the entire record, and we have already determined that " ' "the evidence reveals substantial support . . . for the trial court's conclusion that the weight of the evidence supports the [administrative agency's] findings of fact." ' " (*Crawford, supra,* 53 Cal.App.5th at pp. 336-337.)

Contrary to Barney's contentions, "immoral conduct" within the meaning of section 44932, subdivision (a)(1), applies in a variety of contexts. (See, e.g., *Crawford, supra,* 53 Cal.App.5th at p. 338 [rejecting teacher's argument that " 'immoral conduct' in section 44932, subdivision (a)(1) should be given a colloquial interpretation that includes only conduct that would be deemed 'immoral' in an everyday sense, such as criminal activity and using profanity or racial epithets"]; *Lampedusa, supra,* 194 Cal.App.4th at p. 1466 [upholding dismissal of teacher based on conclusion that "public posting on a Web site of pornographic photos and obscene text constitute immoral conduct"]; *Weiland, supra,* 179 Cal.App.2d at p. 811 [rejecting teacher's "contention that conduct cannot be immoral unless it has some relation to a sexual offense," and upholding dismissal based on teacher falsifying attendance records to maintain her continued employment].)

"A teacher's conduct is 'immoral' . . . when it negatively affects the school community in a way that demonstrates the teacher is 'unfit to teach.' " (*Crawford, supra,* 53 Cal.App.5th at p. 337.) As we have outlined, there was sufficient evidence here to support the trial court's order upholding the

50

Commission's decision based on its determination that Barney engaged in immoral conduct that rendered him unfit to teach.[23]

## H

Based on our conclusion that the trial court's ruling is supported by substantial evidence, we reject Barney's request for attorney fees and costs. (§ 44944, subd. (f)(1) ["If the Commission . . . determines that the employee should be dismissed or suspended, the . . . [D]istrict and the state shall share equally the expenses of the hearing, including the cost of the administrative law judge. . . .  The employee and the . . . [D]istrict shall pay their own attorney's fees."].)

---

[23] Barney cites *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 865, which involved an action by autistic preschool students against a school district and its employees, alleging that their preschool teacher engaged in abusive conduct against them.  This court held that, given the touching and guiding required to instruct autistic children, the students asserting a battery claim against the instructor who allegedly exceeded the required touching were required to show that the touching was unreasonable and intended to harm the students.  (*Id.* at pp. 865, 873.) Barney contends "the primary significance" of the case "related to Mr. Barney's long[-]standing experience teaching special needs children. Having freely and necessarily touched students due to safety concerns in his capacity as a special education teacher, it was not unreasonable for Mr. Barney to continue that habit, custom, and practice due to safety concerns incident to his weight training class."  Barney cites no evidence in the record establishing he touched his special needs students in the same manner as he touched B.P. and other female high school students.  Even if he had, it would not excuse his conduct directed at the teenagers here.  Unlike *Austin B.*, it cannot reasonably be contended that these students or their parents would "consent to [this type of] touching,' or that it was "necessary to control them and protect both their safety and the safety of others."  (*Id.* at p. 873.)

DISPOSITION

The judgment is affirmed.  Respondent is entitled to its costs on appeal.


GUERRERO, J.

WE CONCUR:



HALLER, Acting P. J.



DATO, J.